Cleveland Bar Association *v.* CompManagement, Inc., et al.

[Cite as *Cleveland Bar Assn. v. CompManagement, Inc.,* 111 Ohio St.3d 444, 2006-Ohio-6108.]

(No. 2004–0817—Submitted April 11, 2006—Decided December 6, 2006.)

O'CONNOR, J.

{¶ 1} On December 15, 2004, we determined that "[n]onlawyers who appear and practice in a representative capacity before the Industrial Commission and the Bureau of Workers' Compensation in conformity to Industrial Commission Resolution No. R04–1–01 are not engaged in the unauthorized practice of law." *Cleveland Bar Assn. v. CompManagement, Inc.* ("*CompManagement I* "), 104 Ohio St.3d 168, 2004-Ohio-6506, 818 N.E.2d 1181, syllabus. We are asked to clarify Industrial Commission Resolution No. R04–1–01 and its effect on lay representation in workers' compensation claims.

## PROCEDURAL HISTORY

{¶ 2} Relator, Cleveland Bar Association ("CBA"), filed a complaint with the Board of Commissioners on the Unauthorized Practice of Law pursuant to Gov.Bar R. VII(5) in April 2002. The initial complaint alleged that respondents CompManagement, Inc. ("CMI"), Jonathon Wagner, Robert Bossart, and Bobbijo

Christensen[1] engaged in the unauthorized practice of law by representing employers in workers' compensation claims before the Bureau of Workers' Compensation ("the BWC") and the Industrial Commission ("the IC").

{¶ 3} Following extensive discovery and a hearing, the board issued its final report recommending that this court find that CMI and Christensen had engaged in the unauthorized practice of law. The board based its recommendation partly upon a general definition of the practice of law. It further recognized that it was ill-equipped to consider whether public policy considerations warrant a less aggressive approach.[2] Both relator and respondents filed objections to the board's report.

{¶ 4} On review, this court rejected the recommendation of the board, instead holding that any acts permitted under IC Resolution No. R04–1–01 did not constitute the unauthorized practice of law. *CompManagement I*, 104 Ohio St.3d 168, 2004-Ohio-6506, 818 N.E.2d 1181, at syllabus. We remanded the cause to the board "with instructions to consider any allegations by relator that the respondents failed to act in accordance with standards now set forth in Resolution No. R04–1–01."[3] Id. at ¶ 71.

{¶ 5} On remand, the board considered six separate areas of activity that allegedly constitute the unauthorized practice of law when performed by a layperson on behalf of another: (1) preparing, signing, and filing documents with the BWC and the IC, (2) negotiating settlements and filing settlement paperwork, (3) examining witnesses through either direct or indirect examination, including

---

1. Wagner is the president of CMI and Bossart is the chief executive officer. At the time the complaint was filed, Christensen served as a hearing representative for CMI but she was promoted to regional account executive before the hearing before the board in this case.

2. "The board found itself unequipped 'to evaluate * * * public interest factors or exercise discretion in applying Rule VII,' since it serves only 'as an advisory body under the Supreme Court and * * * merely offers recommendations.'" *CompManagement I*, 104 Ohio St.3d 168, 2004-Ohio-6506, 818 N.E.2d 1181, at ¶ 7.

3. The Industrial Commission created Resolution No. R04–1–01 in compliance with R.C. 4123.06 and Ohio Adm.Code 4121–2–01 in order to govern practice by layperson third-party administrators, union representatives, and employers' representatives before the IC and the BWC. See Preamble to Resolution No. R04–1–01. The Resolution is divided into two sections, the first setting forth acts that do not involve the practice of law, and thus may be conducted by laypersons, and the second enumerating acts prohibited as involving the practice of law. See Sections (A) and (B), Resolution No. R04–1–01. Section (A), for example, permits third-party administrators to assist employers in managing claims as long as that assistance does not entail legal analysis. Among other things, Section (A) specifically allows third-party administrators to investigate allegations regarding claims, perform certain functions at hearings, file various forms created by the IC and the BWC, and advise a client to seek legal representation. See Section (A)(1), (3), (4), and (9). Section (B), on the other hand, prohibits examination in the hearing room, as well as a variety of other acts involving legal citation, interpretation, analysis, or opinion. See Section (B)(1) through (6).

cross-examination, at hearings, (4) engaging in advocacy at hearings, including stating employer concerns, preparing and making arguments, determining the legal import of facts, commenting upon the evidence, and giving an evidentiary summation or closing statement, (5) giving recommendations as to whether to appeal or pursue other legal action, and (6) making recommendations to retain counsel. The board's final report found that CMI had committed the unauthorized practice of law in four areas: settlement, examination of witnesses, hearing-room advocacy, and recommendations to appeal or take other legal action. The board also determined that Christensen had engaged in the unauthorized practice of law through advocacy in the hearing room and recommendations regarding whether to appeal or take other legal action. The board, however, decided that there was insufficient evidence to prove that respondents had engaged in prohibited activities in the first and last areas, i.e., preparing, signing, and filing documents and recommending retention of counsel. Finding no evidence that respondents Bossart and Wagner had personally committed any act constituting the practice of law, the board dismissed them from the suit.

{¶ 6} After the board filed its final report, this court issued an order to respondents to show cause why the report should not be confirmed. Gov.Bar R. VII(9)(A). CBA, CMI, and Christensen have all filed objections to the report.[4]

## VIABILITY OF *CompManagement I*

{¶ 7} Before considering the merits of the board's recommendations, we must first address an overarching objection raised by CBA to our decision in *Comp-Management I*, 104 Ohio St.3d 168, 2004-Ohio-6506, 818 N.E.2d 1181.[5] CBA insists that we should overturn *CompManagement I* and hold that all acts committed by respondents as alleged in this case constitute the unauthorized practice of law. CBA apparently believes that by adopting IC Resolution No. R04–1–01 as the standard for determining whether a third-party administrator has engaged in the unauthorized practice of law, *CompManagement I* created a confusing and unclear standard of conduct. "[R]elator respectfully suggests that the most prudent action for this Court to take is to abandon [*CompManagement I* ] * * * thereby returning uniformity, clarity, consistency and equality of application, predictability, and 'practical workability' to this area of Ohio law." We disagree with CBA's contentions.

---

4. We also acknowledge the multiple amicus curiae briefs filed on behalf of over 100 amici.

5. CBA actually did not raise this issue as a specific objection, yet still briefed the issue in its answer brief and extensively argued the issue at oral argument.

## 1. Historic Role and Function of Third–Party Administrators

{¶ 8} An understanding of the role of third-party administrators within the system is necessary to properly analyze CBA's objection to the use of organizations like CMI in administrative proceedings. The workers' compensation system was intended to operate " 'without necessity for recourse to law suits or employment of attorneys or payment of court costs.' " *Mabley & Carew Co. v. Lee* (1934), 129 Ohio St. 69, 75, 1 O.O. 366, 193 N.E. 745. Instead, the legislature planned the system to function simply, speedily, and inexpensively in order to compensate injured workers while "do[ing] away with the vexatious and protracted litigation which had proved so costly, exhaustive, and unsatisfactory, ofttimes resulting in great injustice." *Goodman v. Beall* (1936), 130 Ohio St. 427, 429, 5 O.O. 52, 200 N.E. 470. As noted in our decision in *CompManagement I*, lay representation "has been a feature of Ohio's workers' compensation system since its inception," and, by 1963, laypersons represented claimants in 60 percent of cases and employers in 50 percent of cases. *CompManagement I*, 104 Ohio St.3d 168, 2004-Ohio-6506, 818 N.E.2d 1181, ¶ 13.

{¶ 9} Actuarial firms became the primary means of employer representation by 1970, and the Unauthorized Practice of Law Committee of the Ohio State Bar Association accordingly entered into an agreement with 13 actuarial service companies in order to set standards of conduct for actuarial firms within the workers' compensation system. See "Standards of Practice Governing Actuarial Services," XLIV Ohio Bar 161 (Feb. 8, 1971); *CompManagement I*, 104 Ohio St.3d 168, 2004-Ohio-6506, 818 N.E.2d 1181, at ¶ 14. The IC and actuarial firms generally followed the 1970 standards of practice until 2004, when the IC enacted Resolution No. R04–1–01 based upon the original 1970 standards of practice. Id. at ¶ 16–17. That Resolution recognized the continuing and extensive involvement of actuarial companies, also called third-party administrators.[6]

{¶ 10} CMI acts as a typical third-party administrator by providing employers a broad array of services intended to manage their workers' compensation premiums and costs.[7] It provides loss-control services, including safety programs

---

6. For example, 70 percent of hearings before the IC had to be continued when the board issued its original decision opining that third-party administrators committed the unauthorized practice of law simply by appearing before the IC. See *CompManagement I*, 104 Ohio St.3d 168, 2004-Ohio-6506, 818 N.E.2d 1181, at ¶ 17.

7. State Fund employers pay an annual premium to the workers' compensation system based upon their industry classification, claims history, reported payroll, and rating program. Ohio BWC Workers' Compensation Guide for State Fund Employers and Their Employees (2006) at 10–11. The Ohio BWC then pays certain benefits to injured workers on behalf of the State Fund employer. Id. at 19–23. Self-insured employers, on the other hand, do not pay any premium, but must pay each valid claim from their own funds. Ohio BWC Workers' Compensation Guide for Self–Insuring Employers and Their Employees (2006) at 3. Large State Fund employers may be "experience

to prevent claims, reviews employer safety procedures, monitors trends in workplace injuries to determine why those injuries occur, categorizes and codes injuries so that an employer may view an overall picture of its losses, and educates employers on the various programs available, such as group-experience ratings, to limit workers' compensation premiums. Also, CMI provides employers with hearing representation before the IC and BWC on certain matters.[8] CMI also aids employers in the settlement of claims and provides actuarial advice to employers. Each employer signs a standard contract with CMI, which explicitly states that "CMI shall not provide any services to the Client which may be construed as the practice of law."

{¶ 11} CMI bases its fee upon certain factors, chiefly, the classification of each employer: generally, group-rated employers pay a percentage of the amount that CMI saves that employer in premium costs, nongroup-rated employers pay a flat fee, and self-insured employers pay a percentage of the loss for the year. Two State Fund employers of the same size and with the same claims experience would pay the same fee even if one required attendance at twice as many hearings.

{¶ 12} CMI employees perform various functions in claims management besides attendance at hearings. For example, they give actuarial advice as to the cost of a claim. CMI representatives who attend hearings prepare the file by determining which portions of the record to present and then perform a limited role in the hearing room, confining themselves to such activities as stating the employer's concerns about an order and pointing out documents, or portions thereof, that support those concerns. These hearing representatives do not question witnesses, although they might talk to an employer's witness prior to the hearing to understand what that witness plans to say. They occasionally give a closing statement or summation of the evidence comprising a few sentences and request the employer's desired result.[9]

---

rated" and receive a discount on or an increase in their premium based upon certain factors, including number and value of claims as well as reserve amounts on pending claims. Ohio BWC Workers' Compensation Guide for State Fund Employers and Their Employees at 11. Employers with a minimum of 500 employees may apply to become a self-insured employer. Id. at 12. Employers may, if qualified, join a group-rated plan with other employers. Id. at 13. Group-rate premiums are generally lower than individual-rate premiums, but group status may be lost based upon claims experience. Id.

8. Only five to seven percent of CMI employees handle hearings. In 1999, those employees attended approximately 35,000 hearings.

9. CMI maintains a written policy which, in accord with IC Resolution R04–1–01, greatly limits the conduct appropriate for a hearing representative. This policy lists prohibited activities and directs representatives to refrain from any activity that may be deemed to be the unauthorized practice of law.

{¶ 13} After attending the hearing, the representative sends a letter to the employer detailing what occurred. Prior to July 2002, the representative also decided whether an appeal would be prudent and made that recommendation known to CMI without ever communicating it to the employer.[10] CMI representatives may receive some training on the principles of compensability, and all CMI representatives attend annual meetings at which the unauthorized practice of law is sometimes discussed.

{¶ 14} If this court were to overrule its decision in *CompManagement I* and follow the recommendations of CBA, third-party administrators such as CMI would be forced to stop appearing before the BWC and IC on behalf of employers. An employer would be required to choose between hiring an attorney for every claim and forgoing representation.[11] The employer would also need to make that decision in regard to preparing, signing, and filing documents, negotiating settlements, determining whether to take any type of legal action, and deciding whether to retain counsel. See Resolution No. R04–1–01(A). Third-party administrators would still function in the actuarial arena, but employers would be required to shoulder a greater share of the work involved both with hearings and claims management in general.[12] Claimants would face similar difficulties with using union representatives. We review the viability of *CompManagement I* in light of these facts.

## 2. Application of *Galatis*

{¶ 15} In *Westfield Ins. Co. v. Galatis,* 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, this court outlined a three-part test for determining whether to overrule precedent. "A prior decision of the Supreme Court may be overruled where (1) the decision was wrongly decided at that time, or changes in circumstances no longer justify continued adherence to the decision, (2) the decision defies practical workability, and (3) abandoning the precedent would not create

---

10. No evidence explains why CMI desired to have this sort of evaluation done if it was never communicated to the employer. The evidence shows only that CMI representatives made a recommendation and that no one outside of CMI reviewed that recommendation.

11. The Resolution purports to guide the activities of third-party administrators, union representatives, and any nonattorney employees of the employer. If we discard the Resolution, none of these individuals would have specific authority to appear before the Industrial Commission or Bureau of Workers' Compensation.

12. If an employer chose not to hire an attorney, the employer would need to file all of its own motions and appeals with the IC and the BWC, prepare files for presentation at hearings, send its own representative to hearings when necessary, and report the outcome of all hearings to CMI, or another third-party administrator, so that the third-party administrator could accurately monitor and evaluate the effect of the claims on workers' compensation premiums.

an undue hardship for those who have relied upon it." Id. at paragraph one of the syllabus.

{¶ 16} CBA first insists that this court wrongly decided *CompManagement I* because the Resolution unconstitutionally intrudes upon this court's power to define the practice of law. "Section 35, Article II of the Ohio Constitution, does not confer upon the Industrial Commission the authority to determine the qualifications of persons engaged in the practice of law before the Industrial Commission." *In re Unauthorized Practice of Law in Cuyahoga Cty.* (1963), 175 Ohio St. 149, 23 O.O.2d 445, 192 N.E.2d 54, paragraph one of the syllabus.

{¶ 17} In *CompManagement I,* 104 Ohio St.3d 168, 2004-Ohio-6506, 818 N.E.2d 1181, this court explicitly recognized that we retain the "exclusive power to regulate, control, and define the practice of law in Ohio," id. at ¶ 39, and that we "unquestionably [have] the power to prohibit lay representation before an administrative agency." Id. Yet even in light of our broad authority in the matter, we decided that it would not be "necessary or desirable for the court to exercise that power to its full extent. The power to regulate includes the authority to grant as well as the authority to deny, and in certain limited settings, the public interest is better served by authorizing laypersons to engage in conduct that might be viewed as the practice of law." Id. In other words, we have already reconciled our decision in *CompManagement I,* which allows limited lay representation before the IC and the BWC, with our unlimited authority over defining what constitutes the practice of law. CBA essentially seeks only a reconsideration of that decision, but it gives us no compelling reasons to reconsider. *CompManagement I* was not wrongly decided by this court at the time we issued it.

{¶ 18} Next, CBA opines that the disagreement among respondents and their amici as to the meaning of the Resolution adopted in *CompManagement I* demonstrates its practical unworkability and that this conclusion is buttressed by the fact that the IC felt compelled to write a 17–page explanation of its own Resolution. The fact that the IC issued an explanation of permitted and prohibited activities does not, in itself, show the unworkability of the Resolution as a standard. Disagreement among relator, respondents, and amici curiae as to the interpretation of that Resolution also does not establish unworkability. Instead, those facts merely show that each party or amicus currently arguing before this court has a disparate financial or legal interest in the matter at hand and that, as with any rule, regulation, or statute, we must from time to time interpret the language to clarify its application.

{¶ 19} CBA claims, although without credibility, that any statute, rule, or regulation ambiguous enough to require interpretation by a court or administrative body is unworkable per se. If so, virtually no enactment would pass muster. The board's final reports submitted in this matter represent the first attempts to

interpret the Resolution. Our role involves reviewing those recommendations in order to aid in the clarification and interpretation of the Resolution. See, generally, *Marbury v. Madison* (1803), 5 U.S. (1 Cranch) 137, 2 L.Ed. 60; *Braddock v. Pub. Util. Comm.* (1940), 137 Ohio St. 59, 65, 17 O.O. 378, 27 N.E.2d 1016. Any "unworkability" remains a product of CBA's imagination.

{¶ 20} Finally, CBA summarily states that abandoning our precedent in *CompManagement I* would not create any undue hardship for those who have relied upon that decision. This statement ignores the financial effect on third-party administrators and, more important, on employers, should this court overrule *CompManagement I* and require either attorney representation or no representation at all. Although financial consequences alone would not prevent this court from overturning any wrongly decided and unworkable precedent, the fact remains that *CompManagement I* is neither wrongly decided nor unworkable. There is no reason for this court to abandon it.

{¶ 21} CBA has failed to support any of the three *Galatis* factors required to overturn our precedent. We, therefore, stand by *CompManagement I* and reiterate our determination to retain a place for lay representation within the workers' compensation system in accordance with Resolution No. R04–1–01.

### DEFINING THE UNAUTHORIZED PRACTICE OF LAW

{¶ 22} Gov.Bar R. VII(2)(A) defines the unauthorized practice of law as "the rendering of legal services for another by any person not admitted to practice in Ohio," and this court retains broad authority to define the practice of law. See *Shimko v. Lobe,* 103 Ohio St.3d 59, 2004-Ohio-4202, 813 N.E.2d 669, ¶ 15; Section 2(B)(1)(g), Article IV of the Ohio Constitution. Any definition of the practice of law inevitably includes representation before a court, as well as the preparation of pleadings and other legal documents, the management of legal actions for clients, all advice related to law, and all actions taken on behalf of clients connected with the law. *Land Title Abstract & Trust Co. v. Dworken* (1934), 129 Ohio St. 23, 1 O.O. 313, 193 N.E. 650, at paragraph one of the syllabus. In regard to corporations, a layperson generally may not represent the corporation or take any legal action on behalf of the corporation before a court or administrative agency. *Union Sav. Assn. v. Home Owners Aid, Inc.* (1970), 23 Ohio St.2d 60, 64, 52 O.O.2d 329, 262 N.E.2d 558; *Cleveland Bar Assn. v. Woodman,* 98 Ohio St.3d 436, 2003-Ohio-1634, 786 N.E.2d 865. ·

{¶ 23} "[L]imiting the practice of law to licensed attorneys is generally necessary to protect the public against incompetence, divided loyalties, and other attendant evils that are often associated with unskilled representation." *CompManagement I,* 104 Ohio St.3d 168, 2004-Ohio-6506, 818 N.E.2d 1181, ¶ 39–40. In spite of these general considerations, however, we have also held that representation may not always require the training and experience of an attorney and that

"the protective interest" may be "outweighed by other important considerations." Id. We have therefore permitted limited lay representation within courts and administrative agencies. *Cleveland Bar Assn. v. Pearlman,* 106 Ohio St.3d 136, 2005-Ohio-4107, 832 N.E.2d 1193, syllabus (permitting lay representation of limited liability companies before a small claims court within certain limits); *CompManagement I,* 104 Ohio St.3d 168, 2004-Ohio-6506, 818 N.E.2d 1181, syllabus (permitting lay representation of claimants and employers before the IC and the BWC within circumscribed limits); *Henize v. Giles* (1986), 22 Ohio St.3d 213, 22 OBR 364, 490 N.E.2d 585, syllabus (permitting limited lay representation before the Unemployment Compensation Board of Review and the Bureau of Employment Services).[13] A layperson may represent another party in these limited instances only as long as he or she remains within the confines of rules governing lay conduct. See *Cincinnati Bar Assn. v. Estep* (1995), 74 Ohio St.3d 172, 657 N.E.2d 499 (layperson who entered into a contingent-fee contract with claimant to pursue workers' compensation claim and pursued that claim engaged in unauthorized practice of law).

{¶ 24} Although the general law defining the practice of law is well settled, this court has not yet set forth the specific standards for proving an allegation of unauthorized practice of law. When a relator alleges that the respondent has engaged in the unauthorized practice of law, and the respondent does not admit to any acts or conduct, how does the relator establish an infraction? Must relator identify the client, the time frame, and the specific act or conduct alleged to be improper? We answer in the affirmative. Presenting the respondent or a respondent's witness with a hypothetical situation and asking what action he or she would take does not, without more, establish the unauthorized practice of law.

---

13. {¶ a} CBA insists that this court overruled *Henize* in *Cleveland Bar Assn. v. Coats,* 98 Ohio St.3d 413, 2003-Ohio-1496, 786 N.E.2d 449. In that case, we held that "the practice of law includes conducting cases in court, preparing and filing legal pleadings and other papers, appearing in court cases, and managing actions and proceedings on behalf of clients before judges, whether before courts or administrative agencies." Id. at ¶ 3. We affirm the continued validity of this general statement, yet note that it is subject to more specific holdings of this court, such as *CompManagement I,* where we have determined that public policy concerns mandate allowing limited involvement by laypersons.

{¶ b} Further, the facts in *Coats* differed greatly from those in either the case at bar or *Henize.* *Coats* involved a paralegal who assisted others fully in their claims before the Bureau of Employment Services and drafted divorce complaints and judgment entries for filing on behalf of pro se individuals. Thus, Coats's activities were not limited to conduct that did not require legal skill or training. *Henize,* on the other hand, involved an actuarial firm conducting limited activities before the unemployment compensation agencies on behalf of others. We stated that "[o]ur decision today does not reach nor permit the rendering of legal advice regarding unemployment compensation laws or board orders. Rather, our narrow holding merely permits lay representation of parties to assist in the preparation and presentation of their cause in order to facilitate the hearing process." *Henize,* 22 Ohio St.3d at 218–219, 22 OBR 364, 490 N.E.2d 585. The two cases are complementary, and *Coats* did not overrule *Henize.*

The answer must describe an *actual incident* before the answer may support an allegation of unauthorized practice.

{¶ 25} The board has previously stated that "[a] finding of unauthorized practice in a contested proceeding must rest upon some evidence of specific conduct." *Disciplinary Counsel v. Palmer* (2001), 115 Ohio Misc.2d 70, 76, 761 N.E.2d 716. We agree with this assessment. A review of case law from this court on the unauthorized practice of law reveals that finding of a violation rests either on specific acts or upon a respondent's admission to specific acts. See, e.g., *Trumbull Cty. Bar Assn. v. Legal Aid State Servs.*, 109 Ohio St.3d 93, 2006-Ohio-1931, 846 N.E.2d 35, at ¶ 4 (respondent prepared adoption papers for two specified clients); *Ohio State Bar Assn. v. Allen*, 107 Ohio St.3d 180, 2005-Ohio-6185, 837 N.E.2d 762, at ¶ 5 (witness identified three divorce complaints and one trust document prepared for others by respondent); *Disciplinary Counsel v. Alexicole, Inc.*, 105 Ohio St.3d 52, 2004-Ohio-6901, 822 N.E.2d 348, at ¶ 3 (respondent admitted to regularly preparing settlements for others and providing representation before securities arbitrators); *Ohio State Bar Assn. v. Kolodner*, 103 Ohio St.3d 504, 2004-Ohio-5581, 817 N.E.2d 25, at ¶ 3 (respondent admitted to regularly advising and conducting settlements in disputed debt claims); *Toledo Bar Assn. v. Chelsea Title Agency of Dayton, Inc.*, 100 Ohio St.3d 356, 2003-Ohio-6453, 800 N.E.2d 29 (respondent admitted to preparing deeds for others to convey real property).

{¶ 26} We agree with *Palmer* and hold that an allegation that an individual or entity has engaged in the unauthorized practice of law must be supported by either an admission or by other evidence of the specific act or acts upon which the allegation is based. See *Palmer*, 115 Ohio Misc.2d at 76, 761 N.E.2d 716. Although CBA attempts to claim that the evidence supported all of its allegations, CBA's insistence ignores the fact that the board, as noted below, supported some of its findings of violations solely with generalized evidence or responses to hypothetical questions. CBA presents no legal principle, citation, or argument that contradicts this basic principle that an allegation must be supported by either an admission or *specific* evidence of an act constituting the infraction. We, therefore, must review the record in this case with this simple legal principle in mind.

### INDUSTRIAL COMMISSION RESOLUTION NO. R04–1–01

{¶ 27} IC Resolution No. R04–1–01 provides:

{¶ 28} "(A) The following activities shall be permitted before the Industrial Commission or the Bureau of Workers' Compensation, to the extent performed by third-party administrators, by union representatives until permanent guidelines are provided by the Ohio Supreme Court, or employees of an employer.

{¶ 29} "1. Investigation, or assistance to injured workers and employers in investigating, the facts with respect to any claim, including discussing the facts and their relationship to the claim with employers, witnesses, and others, preparing and securing statements, and preparing and obtaining reports regarding the facts;

{¶ 30} "2. Assistance to injured workers and employers in the administration of a claim and the filing of claims and appeals, without making any legal determination respecting such claims or appeals, before the administrator of the Bureau of Workers' Compensation and/or the Industrial Commission of Ohio;

{¶ 31} "3. Attendance at any hearing before the Industrial Commission for the purposes of recording and reporting any action taken at such hearing, reporting the factual results of any claim investigation, apprising the hearing officer or officers of documents or parts thereof that are in the file or that are missing from the file, including medical reports, filing documents, requesting a postponement or continuance of the hearing, and discussing matters within the independent knowledge of the representative, subject to all the limitations as set forth below;

{¶ 32} "4. Completion and submission of any and all records and reports with the Bureau of Workers' Compensation or the Industrial Commission of Ohio regarding injured workers and employers, including, but not limited to, any and all forms promulgated and adopted by the Industrial Commission and the Bureau of Workers' Compensation, either written, verbal or electronically produced;

{¶ 33} "5. Completion and submission of records and reports dealing with job classifications pertinent to premium rates and other Bureau of Workers' Compensation premium programs;

{¶ 34} "6. Completion and submission of any and all reports or forms concerning, but not limited to, premiums, payroll rate adjustment protests, settlements, and handicap reimbursement requests before the Bureau of Workers' Compensation or the Industrial Commission;

{¶ 35} "7. Filing protests within the Bureau of Workers' Compensation to the Adjudicating Committee, the Self–Insured Review Panel, the Self–Insuring Employers Evaluation Board, or the Administrator, or his designee, as permitted by statute, and representation before any of these bodies, subject to the limitations set forth below;

{¶ 36} "8. Preparation of reports to employers dealing with the status of risks, status of reserves and actuarial analysis thereof;

{¶ 37} "9. Advise employers or injured workers to seek legal representation.

{¶ 38} "(B) In recognition that no person may practice law in Ohio who has not been admitted to the Bar by the Supreme Court of Ohio, and further recognizing that the practice of law is defined by the Ohio Supreme Court, non-lawyers may

not properly perform the following functions before the Industrial Commission or the Bureau of Workers' Compensation:

{¶ 39} "1. Examine or cross-examine the claimant or any witness, directly or indirectly;

{¶ 40} "2. Cite, file or interpret statutory or administrative provisions, administrative rulings or case law;

{¶ 41} "3. Make and give legal interpretations with respect to testimony, affidavits, medical evidence in the form of reports or testimony, or file any brief, memorandum, reconsideration or other pleading beyond the forms actually provided by the Commission or the Bureau;

{¶ 42} "4. Comment upon or give opinions with respect to the evidence, credibility of witnesses, the nature and weight of the evidence, or the legal significance of the contents of the claims file;

{¶ 43} "5. Provide legal advice to injured workers and employers;

{¶ 44} "6. Give or render legal opinions, or cite case law or statutes to injured workers and employers before, at or after the time when claims are initially certified or denied certification as valid claims by the employer upon the presentation of claim applications by employees;

{¶ 45} "7. Provide stand-alone representation at hearing by charging a fee specifically associated with such hearing representation without providing other services."

{¶ 46} CBA argues that we must interpret the Resolution as prohibiting any act not explicitly allowed. As support for that claim, CBA cites this court's direction in *CompManagement I*, 104 Ohio St.3d 168, 2004-Ohio-6506, 818 N.E.2d 1181, instructing the board on remand to consider the allegations "in accordance with standards now set forth in Resolution No. R04–1–01." Id. at ¶ 71. CBA believes that our instruction requires that any acts not in accord with the explicit language of the Resolution be interpreted as violating it. For instance, as the Resolution does not specifically allow a third-party administrator to state the employer's concerns during a hearing, then a third-party administrator who does so engages in the unauthorized practice of law.

{¶ 47} CMI, on the other hand, recommends a three-tiered analysis, based in part on our decision in *CompManagement I*, to determine whether actions not specifically covered by the Resolution are nevertheless permissible because they do not require exercise of legal skill or judgment or because allowing lay representation serves the public interest.[14] Although respondent Christensen

---

14.  {¶ a} CMI specifically suggests the following analysis:

   {¶ b} "(1) Is the conduct specifically addressed in R4–1–01? If so, the inquiry should end.

does not go so far as to suggest this approach, she also argues that acts not explicitly allowed by the Resolution may, nonetheless, be permitted when they are prerequisites for acts allowed by the Resolution. For example, she claims that, as the Resolution allows a third-party administrator to advise a client to retain counsel, the third-party administrator must also be permitted to make the evaluation necessary to advise the client.[15]

{¶ 48} Section (A) of the Resolution specifically lists nine separate categories of activity that may be performed by third-party administrators, and Section (B) lists seven categories of activity that they may never perform, but the Resolution does not unequivocally explain whether either list is exhaustive. The preface to Section (B) recognizes that this court defines the practice of law and then explicitly prohibits any act that involves legal analysis, skill, citation, or interpretation. This language recognizes the authority of this court to determine that additional acts not listed in the Resolution may also constitute the practice of law, which defeats any argument that an act not explicitly prohibited by the Resolution must be permissible. However, Section (A) explicitly allows certain specific acts, such as the preparation and filing of any forms created by the BWC or the IC, and also allows more generalized conduct such as "[a]ssistance to injured workers and employers in the administration of a claim * * * without making any legal determination respecting such claims."

{¶ 49} The Resolution itself, therefore, implies that it can encompass an ever-evolving definition of the practice of law. It allows any act that aids in the administration of a claim as long as the act does not involve legal analysis, skill, citation, or interpretation. We accordingly reject both the strict interpretation urged by CBA and the three-part test suggested by CMI. Instead, we will consider the allegations in this case under a more fluid approach, which allows third-party administrators to offer general claims assistance as long as that assistance does not involve legal analysis, skill, citation, or interpretation. See, e.g., *Dayton Bar Assn. v. Lender's Serv., Inc.* (1988), 40 Ohio St.3d 96, 532 N.E.2d 120, syllabus (the mere use of legal terms as headings in a title abstract without any legal analysis does not constitute the practice of law); *State ex rel. Doria v. Ferguson* (1945), 145 Ohio St. 12, 30 O.O. 241, 60 N.E.2d 476, paragraph one of the syllabus (providing that a title report containing only facts in the public

{¶ c} "(2) If the conduct is not specifically addressed in R4–1–01, the next issue should be whether the activity done in a representative capacity requires legal skill or judgment. * * * If not, the inquiry should end with a finding of no unauthorized practice of law.

{¶ d} "(3) If the conduct then falls within a generalized definition of the practice of law, the final inquiry should be whether the public interest served by the activity in question allows for these activities to be undertaken by non-lawyers."

15. This particular issue is discussed in ¶ 111–114.

record without engaging in any legal analysis does not constitute the practice of law); *Gustafson v. V.C. Taylor & Sons, Inc.* (1941), 138 Ohio St. 392, 397, 20 O.O. 484, 35 N.E.2d 435 (filling out preprinted forms for realty sales involves "ordinary intelligence rather than the skill peculiar to one trained and experienced in the law" and did not constitute the practice of law).

## FINAL REPORT OF THE BOARD ON REMAND

{¶ 50} The board's amended final report on remand detailed findings of unauthorized practice of law in six different areas, some including multiple subparts. We will consider each in turn and analyze them in light of the extensive record.

### 1. Preparation, Signing, and Filing of Documents

{¶ 51} The board first considered whether respondents practiced law through the "[p]reparation, signing, and filing of documents in handling claims before the Industrial Commission on behalf of employers." The record indicates that CMI, through various employees, prepares, signs, and files a multitude of different forms created by the BWC and the IC on behalf of employers. The board found that the Resolution specifically allowed this area of activity.[16] No party has filed an objection to this first recommendation, and we adopt the report of the board on this issue.

### 2. Negotiation of Settlements

{¶ 52} Next, the board considered whether respondents' "negotiation and involvement with settling claims" amounted to the practice of law under the Resolution. The board concluded that "[s]ettlement negotiations require legal review and analysis of claims, evaluation of evidence, credibility of witnesses, and advice as to outcomes," and thus determined that CMI's involvement in settlement negotiations stepped over the line into the unauthorized practice of law. In reaching that conclusion, the board relied upon Resolution Sections (B)(3) through (B)(6), which collectively prohibit a third-party administrator from providing legal interpretation of the evidence, commenting on the weight, credibility, and legal significance of the evidence, providing legal advice, and interpreting the law. As the board believed that all settlement negotiations necessarily involve legal interpretation and analysis, it determined that such negotiations

---

16. Section (A)(4) of the Resolution allows the "[c]ompletion and submission of any and all records and reports with the [BWC] or the [IC] regarding injured workers and employers, including, but not limited to, any and all forms promulgated and adopted by the [IC] and the [BWC], either written, verbal or electronically produced." Sections (A)(5) and (A)(6) further allow third-party administrators to submit all reports and records dealing with "job classifications pertinent to premium rates" and all reports and forms concerning "premiums, payroll rate adjustment protests, settlements, and handicap reimbursement requests."

constitute the practice of law. The board found that CMI had, therefore, committed the unauthorized practice of law by conducting settlement negotiations and filing settlement applications.

{¶ 53} The record in this area shows that CMI often recommends the amount to offer in settlement and engages in other limited settlement-related activities. In general, either the employer will request that CMI provide a suggested settlement amount or CMI will make an unsolicited recommendation, but usually only in cases where large amounts of money are involved. In determining what settlement amount to suggest, CMI conducts an actuarial analysis of the value of that claim and determines whether it is large enough to settle based upon the reserve calculation [17] placed on the claim by the BWC. CMI's recommendation to settle at a certain amount is "completely driven by the mathematical computations on reserves."

{¶ 54} At least one client of CMI believes that CMI's recommended settlement amounts are based upon CMI's experience with similar claims and the effect the claim will have on reserves. Another client customarily calls CMI for a suggested settlement figure and believes that CMI bases its suggestion on a comparison to similar cases. Neither client, however, indicated any belief that CMI conducted any legal analysis to arrive at the settlement amount.

{¶ 55} After the client decides upon a specific amount to offer a claimant, CMI delivers the offer to the claimant. There is no evidence in the record of the authority CMI might or might not have to negotiate when the claimant rejects the offer. In fact, the record suggests that CMI merely acts as the messenger for the employer and does not engage in back-and-forth negotiation.

{¶ 56} If the claimant accepts the settlement, it is often CMI that then files the necessary settlement application, using forms created and provided by the BWC and the IC. Those standard forms call for factual information, such as information identifying the employer and claimant and the amount of the suggested settlement, but do not call for any legal argument. Although the forms also request an explanation of why the circumstances make the settlement desirable, actuarial concerns of the employer and financial concerns of the claimant, for example, could satisfy this request.

{¶ 57} After considering the language of the Resolution and the record, we reject any finding that CMI practiced law by settling claims. First, CMI applies an actuarial analysis to a claim to determine whether settlement would be beneficial for the employer. CMI considers the factors used to predict the cost of

---

17. A "reserve" is a prediction of how much of the cost of a particular existing claim remains to be paid, i.e., how much more the claim will cost beyond what has already been paid. See Ohio BWC State Insurance Fund Manual (2006–2007) 140.

the claim and calculates the amount the claim will be likely to cost an employer over its lifetime. CMI then presents those numbers to the employer for consideration, and the employer determines, in its discretion, whether it would like to offer a settlement.

{¶ 58} No evidence supports the allegation that CMI considers legal issues in this analysis, and the clients who testified appeared to understand that CMI does not engage in legal analysis.[18] As long as CMI bases its recommendation on the actuarial value of the claim, especially in cases where the claim has already been allowed so that no legal issues remain, CMI is not practicing law. CMI's activities require no legal skill and training. Instead, those actions utilize specialized actuarial skill and training that most attorneys simply do not possess.[19] This act, therefore, falls within Section (A)(2) of the Resolution, which allows assistance to employers in claims administration as long as that assistance does not involve any legal determinations.

{¶ 59} Second, CMI does not conduct any classic negotiation in the legal sense. CMI simply takes a figure approved by the employer and presents it to the claimant. CMI does not conduct any back-and-forth negotiation and makes no legal determinations in presenting the number to the claimant.[20] In fact, CMI merely operates as a messenger, something that hardly requires legal skill.

{¶ 60} Although the Resolution does not explicitly allow a nonlawyer to either suggest a settlement amount or "negotiate" a settlement, the activities demonstrated in this case do not involve the exercise of legal judgment, skill, or training. Actuaries are highly skilled in performing the first function, and messenger services could be performed by virtually anyone. These actions simply do not involve the practice of law.

{¶ 61} Likewise, the filing of a settlement application does not equate to the practice of law. Section (A)(4) of the Resolution explicitly allows a third-party

---

18. The state of Ohio in its amicus brief notes that 90 percent of claims being considered for settlement have already been allowed such that no legal issues remain. Compensability, causation, and timeliness have already been determined, and only the value of the allowed claim remains in question.

19. Wagner testified at the hearing that attorneys handling workers' compensation claims frequently turn to CMI for "the numbers," i.e., the reserve calculations needed for forming a realistic settlement figure. A commissioner for the IC also stated that application of the factors used in calculating the value of a claim involves actuarial analysis that attorneys typically do not understand.

20. The facts of this case remove it entirely from the purview of *Cincinnati Bar Assn. v. Cromwell* (1998), 82 Ohio St.3d 255, 695 N.E.2d 243, cited by the board in support of its recommendation. The individual in *Cromwell* represented parties in personal injury suits, including conducting settlement negotiations with insurance companies and advising clients of their legal rights. The sort of settlement negotiation involved in *Cromwell* does not exist in this case.

administrator to file any and all forms created by the BWC and the IC. The settlement forms prepared and filed by CMI on behalf of employers are forms created by those agencies and fall within this allowance. Any finding that a third-party administrator may not complete these forms, which require entry of only factual, and not legal, information, is unsupported by the Resolution and general principles regarding the practice of law.

{¶ 62} We reject the board's conclusion that a third-party administrator may not suggest a settlement amount based on actuarial data, communicate an approved settlement figure to a claimant, or file settlement forms created by the BWC or the IC. As long as CMI makes no legal determinations and acts merely as a messenger, these activities simply do not require the specialized training and skill of an attorney and are permitted by the Resolution.

### 3. Examination of Witnesses

{¶ 63} The board next found that CMI committed the unauthorized practice of law by engaging in direct and indirect examination of witnesses during hearings. The board supported this finding by citing Section (B)(1) of the Resolution, which prohibits a third-party administrator from "examin[ing] or cross-examin[ing] the claimant or any witness, directly or indirectly." The board found insufficient evidence that any of the individual respondents had committed a violation in this area.

{¶ 64} Section (B)(1) undoubtedly prohibits the acts that the board alleges CMI committed. Looking at the record, however, we find that CMI never engaged in either the direct or indirect examination or cross-examination of any witnesses.

{¶ 65} Black's Law Dictionary defines "direct examination" as "[t]he first questioning of a witness in a trial or other proceeding, conducted by the party who called the witness to testify." Black's Law Dictionary (8th Ed.2004) 492. It further defines "examination" of witnesses as "[t]he questioning of a witness under oath." Id. at 601. The prohibition against examining or cross-examining witnesses "indirectly" is not explained in the Resolution, but it is clear that a nonlawyer may not circumvent the prohibition by such stratagems as channeling questions through the hearing officer.

{¶ 66} The record does not reveal any instances of CMI representatives engaging in direct examination, i.e., questioning a witness called by the employer. There is evidence that at times, CMI would prompt an employer's witness unfamiliar with the process to tell the hearing officer whatever he or she would like to say on behalf of the employer. Although CMI's policy on the unauthorized practice of law does not prohibit direct examination of an employer's witness, no evidence shows that any lay representative has actually engaged in that activity.

{¶ 67} Examination requires questioning. CMI representatives do not ask questions and do not guide the witness's testimony in any fashion. The act of

prompting an employer's witness to present his or her statement to the hearing officer can hardly be characterized as "examination." The simple prompting of a witness to speak requires absolutely no legal training or skill. Although any direct questioning of a witness would indisputably constitute the practice of law, no evidence shows that CMI has engaged in this act at any time. The board's finding in this respect is erroneous.

{¶ 68} "Cross-examination" is "[t]he questioning of a witness at a trial or hearing by the party opposed to the party who called the witness to testify." Black's Law Dictionary (8th Ed.2004) 405. Again, cross-examination inherently requires questioning. Application of this definition to acts revealed in the record, however, proves complex.

{¶ 69} CMI's policy on the unauthorized practice of law specifically prohibits a representative from engaging in "[d]irect cross-examination of any injured worker at a Workers' Compensation hearing." The record does not demonstrate that CMI representatives directly ask questions of any witness.[21] Instead, CMI representatives tell the hearing officer the employer's concerns with a claim,[22] and the hearing officer then has the discretion to ask questions of any witness about that stated concern. If a hearing officer opts not to ask any questions, the CMI representative remains quiet and never attempts to ask questions directly.[23] As the Resolution prohibits both direct and indirect examination, either on cross

---

21.  {¶ a} Three possible exceptions exist. First, the president, Wagner, indicated that many years ago on very rare occasions, he witnessed a hearing officer turn directly to the claimant and instruct him to directly answer the concern raised by the employer or its representative. He further stated that he also witnessed a claimant's attorney instruct an employer's representative to ask questions directly of the claimant in order to make the hearing more time efficient. As this testimony describes only a generalized situation without referring to any actual, specific acts and does not even identify whether Wagner witnessed these episodes as a mere attendee or actually experienced them while serving CMI as a hearing representative, we refrain from finding that CMI engaged in the practice of law based solely upon this generalized statement.

{¶ b} Second, multiple posthearing claims letters authored by Christensen state that she "questioned" something during the hearing. When asked about the references, Christensen explained that she did not actually engage in any questioning and used inaccurate terminology in her posthearing letters.

{¶ c} Finally, in a video played before the board, a CMI employee stated that she had been "called out" for directly questioning a claimant. That employee was never called to testify, and therefore the statements that she made during the video were not explained or expanded upon, and there is nothing in the video to suggest whom she was employed by at the time she had questioned a claimant. The statement on the video does not amount to specific evidence of or an admission to practicing law. Wagner testified only that the individual speaking on the video was a CMI employee, not that he had any personal knowledge of the statements that the employee had made.

22.  We address the propriety of stating an employer's concerns during a hearing at ¶ 73–74.

23.  The transcript of a purported "training video" produced by CMI during discovery contains vague evidence that one CMI representative may have been "called out" by a hearing officer for

or on direct, we must determine whether this type of act amounts to indirect cross-examination.

{¶ 70} The acts evidenced in this case could not be characterized as the practice of law, even in the broadest of all possible definitions. As noted above, the record shows that the CMI representative merely states the employer's concerns, and it is the hearing officer who maintains the discretion to ask questions or not ask questions. When the asking of questions is a matter solely within the hearing officer's discretion, and the representative has no control over either the form or substance of any question or over whether questions are asked at all, the representative has not engaged in examination. No evidence in the record even suggests that CMI representatives ever state an employer's concerns in the form of a question to a witness. It is even more difficult to find that "examination" has occurred when no question may ever be stated and no witness need ever be invited to address any issue raised. As with direct examination, the acts of the CMI representatives that the board qualified as indirect cross-examination require no actual legal skill or training. The representative merely informs the hearing officer of the employer's concerns related to a claim and does not engage in any questioning.[24]

{¶ 71} The third-party administrator may properly share the employer's concerns or information with the hearing officer, and that information may properly form the basis for questions posed by the hearing officer in his or her sole discretion. The facts in this case do not reveal that any CMI representative conducted an examination in the hearing room. We, therefore, reject the board's determination that CMI committed the unauthorized practice of law in this area.

## 4. Various Acts in the Hearing Room

{¶ 72} The board found that both CMI and Christensen committed the unauthorized practice of law by advocating employer's concerns through presentation of factual issues, evidence, and arguments in violation of Section (B)(1) through (7) of the Resolution.[25] The board relied heavily upon Christensen's

---

incorrectly engaging in cross-examination. The transcript of the video, however, does not specify what the representative actually did. The transcript further fails to elucidate the alleged acts with any specificity, and CBA never deposed or called the representative to testify. Also, Christensen indicated that she had been trained in cross-examination techniques while working for CMI. That training, however, related only to unemployment hearings, and she further testified that she had never used that training to question any witnesses in workers' compensation hearings.

24. Although Wagner indicated that representatives occasionally questioned a claimant through the hearing officer, no evidence in the record contradicts that such questioning was subject to the absolute discretion of the hearing officer. Again, the hearing officer need never ask any question of the claimant in relation to issues brought to his attention by the employer's representative.

25. The board stated that the enumerated activities in this part of the order violated Section (B)(1) through (7) of the Resolution, but did not allege any activities that would violate (1) (examination or

purported admission that she "prepares arguments" to be made and determines issues to present to the IC. The board additionally found that CMI and Christensen improperly counseled clients, though it failed to provide detail or to cite record evidence in support of this finding. The allegations of improper activities in this part of the board's order on remand may be broken down into six categories: (1) stating employer concerns, (2) preparing and making arguments, (3) determining the legal significance of facts, (4) commenting on the importance of facts, (5) giving a summation of evidence or closing statement, and (6) counseling clients. We will consider each in turn.

a. Stating Employer Concerns

{¶ 73} The record reveals that the employer provides to CMI a list of concerns it has with each challenged order. Despite the fact that CMI representatives may generally understand some of the basic legal precepts relevant to claims, they make no independent legal determinations as to what issues to raise. Rather, they either state verbatim or paraphrase that list during the hearing.[26] Typical employer concerns as evidenced by the record include issues of causation, compensability, and timeliness of a claim, all phrased as references to factual inconsistencies or to the lack of medical evidence.[27]

{¶ 74} Stating an employer's concerns to the hearing officer is an act neither specifically allowed nor prohibited by the Resolution, and so we must consider the nature of the act itself in order to determine whether it amounts to the practice of law. The CMI representative essentially acts only as a conduit of information and makes no determinations requiring legal skill or training. Instead, the representative *might* choose to employ his or her communications skills in order

---

cross-examination) or (7) (charging a fee for representation). Section (B)(2) through (6) generally prohibit a third-party administrator from citing, interpreting, or filing statutory or case law, giving legal interpretation of evidence, commenting on the legal significance of evidence, providing legal advice to clients, and giving legal opinions at any time during the claims process.

26. Although the board envisioned CMI representatives poring over files to determine whether legal doctrines such as causation or statutes of limitations apply, and one representative (an attorney) stated that he would independently decide to point out something if the employer missed an obvious problem, factual or otherwise, no evidence supports that any lay representative ever actually exercised independent judgment in that way. Evidence in the record supports that the employer determines what concerns to raise without input or advice from CMI or its employees.

27. Specific concerns revealed by the record included the following: (a) no objective indication of injury, (b) no indication of the cause of the injury, (c) lack of evidence linking the injury to work activity, (d) lack of legible medical records, (e) lack of any medical diagnosis, (f) no specific description of any injury, (g) lack of medical records from an authorized provider, (h) no evidence that claimant engaged in job search (relevant to whether to grant wage loss), (i) no indication that a prescription drug was medically necessary, (j) evidence of a positive drug test, (k) evidence of a prior injury to the same area of the body involved in the current claim.

to paraphrase the listed concerns, but does nothing more than that.[28] Such activity aids in the administration of a claim, as allowed by (A)(2), without trespassing upon the arena of legal skill or training. We therefore reject the board's recommendation that such an act involves the practice of law.[29]

b. Preparing and Making Arguments

{¶ 75} The board found that Christensen admitted that she prepared and made arguments before the hearing officer.[30] In apparent reliance on this sole "admission," the board determined that such argument must be the practice of law, violating prohibitions set forth in (B)(2) through (B)(6), and thus found that both Christensen and CMI had committed the unauthorized practice of law by conducting this activity. A more in-depth review of the record, however, reveals otherwise.

{¶ 76} Black's Law Dictionary defines "argument" as "[a] statement that attempts to persuade; esp., the remarks of counsel in analyzing and pointing out or repudiating a desired inference, for the assistance of a decision-maker." Black's Law Dictionary (8th Ed.2004) 114. "Argument" is "[a] reason offered to induce belief and convince the mind," Ballentine's Law Dictionary (3d Ed.1969) 91, or "[a]n effort to establish belief by a course of reasoning." 1 Bouvier's Law Dictionary (3d Ed.Rev.1914) 237. "Argument of counsel" is defined as "[t]he discussion by counsel for the respective parties of their contentions on the law and the facts of the case in hand in order to aid the [factfinder] in arriving at a correct and just conclusion." Ballentine's Law Dictionary at 91.

{¶ 77} Clearly, "argument" in the context of the practice of law involves more than just stating facts; it is a process of analyzing their implications in light of the relevant law, and then expounding on them in such a way as to persuade the listener to reach a conclusion not apparent from the facts or ideas themselves. In other words, merely pointing to facts in the record without attempting to persuade that those facts have a particular implication or legal significance is not "argument."

---

28. No evidence in the record suggests that such paraphrasing involves altering the stated concern in order to advocate a certain outcome.

29. If a CMI representative considered the claim and determined what issues to raise, in whole or in part based upon legal doctrines such as causation and compensability, he would be conducting activity prohibited by (B)(2) through (B)(6) and would be engaged in the practice of law. Likewise, if the representative paraphrased the concern by turning it into a persuasive or argumentative statement, he may be practicing law. There is no evidence, however, that such a thing occurred in this case.

30. {¶ a} The following exchange occurred during Christensen's deposition:
{¶ b} "Q. Okay. Do you prepare arguments to be made at those hearings?
{¶ c} "A. Yes."

{¶ 78} For example, an attorney might argue that a claim is barred by the statute of limitations because the claimant failed to file the claim in a timely manner. If the attorney merely stood up and said, "This document states that the claim was filed on this date, and this document shows that the injury occurred on that date," the statement is factual only, unaccompanied by argument. Although the facts themselves might lead a hearing officer or judge to determine that a legal defense, the statute of limitations, applies to bar the claim, the speaker has made no attempt to "argue" that result by explaining the legal conclusion required by the facts. The hearing representatives, when writing to employers following each hearing, often used variations on the word "argue" to describe the actions taken in the hearing room. As already noted, Christensen even agreed in deposition that she "prepare[d]" and "present[ed]" "arguments" at the hearings. On their face, these admissions appear to support a finding that CMI and its representatives acted contrary to the Resolution and practiced law. When considered with the remaining record, however, these references simply do not prove that CMI or its employees practiced law.

{¶ 79} When CMI representatives were questioned at depositions regarding statements they had made in posthearing letters indicating that they had "argued" or "questioned" some fact or issue at a hearing, the representatives consistently explained that at the hearings, they had merely stated the employer's concerns regarding the claim and had pointed out the documents that demonstrated the employer's concerns.[31] According to one CMI representative, if, for example, the employer wished to challenge a claim based on the statute of limitations, the CMI representative would merely point out the date the claim was filed and the date of the injury as revealed by documents in the file, and would never use the term "statute of limitations" or argue that the facts mandated dismissal. All CMI representatives denied making legal arguments. One client who regularly attended the hearings for his company also testified that he had never witnessed a CMI representative cite a case, use legal terms, or cross-examine a claimant.

{¶ 80} Christensen's admission in her deposition to preparing arguments and presenting them at hearings also fails to prove that she practiced law. She explained that what she meant by "presenting arguments" is presenting the employer's concerns and pointing out the documents related to those concerns. Her preparation amounts to merely determining which documents in the file support each listed concern.[32] When CMI representatives merely state the facts

---

31. Section (A)(3) explicitly allows a third-party administrator to attend the hearing and "appris[e] the hearing officer or officers of documents or parts thereof that are in the file or that are missing from the file, including medical reports."

32. A discussion regarding whether CMI representatives practice law when they determine which documents support an employer's concerns can be found herein at ¶ 83–84.

related to the employer's concerns and point out documents that support those facts, they are not practicing law.

{¶ 81} Because the acts that the board determined were legal argument did not require legal skill or training, we reject the board's finding in this area. A third-party administrator may not prepare and make legal arguments. Resolution Sections (B)(2) through (B)(6). But that same third-party administrator may present an employer's concerns and pinpoint documents in support of those concerns. (A)(3). We find that neither Christensen nor CMI practiced law in this regard.

### c. Determining the Legal Significance of Facts

{¶ 82} The board also found that CMI and Christensen practiced law by determining the legal significance of facts in violation of (B)(3).[33] Christensen, for example, stated that she determined which documents and facts to present to a hearing officer based on her understanding of what is important in a workers' compensation claim.[34] She also indicated that, using her experience, she would occasionally request a finding from the hearing officer that a claimant has a specific percentage of permanent partial impairment, even though conflicting evidence existed as to the percentage of impairment.

{¶ 83} This and other, similar testimony apparently led the board to believe that CMI employees, untrained in the law, were reviewing files and deciding whether to present certain defenses relating to causation or other legal doctrines. Although each CMI representative would present only facts during the hearing, the board believed that the CMI representative also made the initial determination of the legal significance of the facts. If Christensen, or any CMI representative, used legal analysis and skill to decide which documents to present at the hearing, she would, at the least, violate Section (B)(3) and commit the unauthorized practice of law. In light of Christensen's entire testimony, however, the record does not reveal that such was actually the case.

---

33. Section (B)(3) of the Resolution states that a third-party administrator may not "[m]ake and give legal interpretations with respect to testimony, affidavits, [or] medical evidence." The board does not specify the particular acts that it found constituted the unauthorized practice of law in this area, so we must consider all possibilities.

34. {¶ a} Testimony from Christensen's deposition is as follows:
    {¶ b} "Q. Okay. How do you select which portions thereof to read?
    {¶ c} "A. Parts that are important.
    {¶ d} "Q. Important based on what standard?
    {¶ e} "A. The standard as to what's important in a Worker's Compensation claim."
    {¶ f} See fn. 47 for a discussion of whether CMI committed the unauthorized practice of law by making compensability determinations.

{¶ 84} All CMI representatives denied using independent judgment to determine the legal significance of a fact. Although they generally understood that certain facts did carry legal significance, they relied on the employer's list of concerns to determine what facts to emphasize at the hearings.[35] When read in context, Christensen's comment about determining what issues to present based on what is important in a workers' compensation claim reveals only sloppy testimony, not that she had practiced law. She explained that she determined which documents to present based on whether they supported the factual concerns of the employer and did not make decisions based on the legal significance of the facts.

{¶ 85} If, for example, an employer stated that it wished to challenge an order because the claimant had filed his claim too late and had tested positive for a drug immediately after the injury, a person untrained in the law could easily decide that he should present documents that showed the date of injury and the date of filing, as well as documents that revealed the results of the drug test. And he would need no legal training to determine which documents demonstrate those facts. As long as the employer had already recognized the legal issue involved and advised the CMI representative of the factual concerns related to the issue that it wanted the representative to stress, the CMI representative needed only to search the record for the relevant facts and never needed to apply any legal analysis.[36]

{¶ 86} Likewise, if, for example, a claimant's doctor determines that the claimant has a seven percent impairment and the employer's doctor finds only a three percent impairment, Christensen needs no legal training to suggest that a claimant should be found to have a specific percentage of impairment that falls between those two numbers. Common sense alone leads to that conclusion. If any type of training would be helpful, it would be medical, not legal, training.

---

**35.** CBA emphasized the training materials created by and circulated within CMI. These materials did indeed explain legal doctrines related to the issue of compensability, but there is no evidence that any CMI representative ever used this training to make an independent determination or recommendation as to the legal significance of a fact. A person who receives some basic training on legal issues does not practice law simply by recognizing or understanding a legal principle. He practices law only when he uses that training to give advice to or represent another.

**36.** As noted above, employer concerns undoubtedly involve facts that the employer believes will have a bearing on the legal determination to be made by the hearing examiner. And the facts relevant to the concern should be apparent from the concern itself. If, however, the employer were to state its concern in legal terms alone, such as "lack of causation," "not compensable," or "statute of limitations," the representative would stray into the practice of law by independently determining the meaning of the term, its application to the particular claim, and which facts support the employer's legal concern. This would be a violation of various subsections under section (B). But there is no evidence of that practice in this case.

{¶ 87} Not only does Christensen's testimony fail to support the board's finding that she exercised legal judgment in order to determine the significance of facts in the claim file, her testimony contains only generalizations of the work she does and does not pinpoint any actual, specific act that might support a finding that she committed the unauthorized practice of law.[37]  As noted above, any allegation in this regard made in a contested case must be supported by evidence of a specific and particular act.  See *Palmer,* 115 Ohio Misc.2d 70, 761 N.E.2d 716. CBA has failed to support its allegations in this regard with specific evidence of a violation.  The mere possibility that such an act might have occurred is clearly not enough to find the unauthorized practice of law.

{¶ 88} The record in this case reveals that CMI representatives do not make determinations as to the legal significance of any facts in the file.  Instead, they merely decide which facts are relevant to the list of employer's concerns.  A CMI representative uses basic, nonlegal skills to determine which documents to emphasize;  for example, if an employer wishes to challenge a claim based on the fact that the claimant had a prior back injury, the representative knows to bring the document evidencing the prior back injury to the hearing officer's attention. Thus, we reject the board's finding that the representatives determine the legal significance of facts.

d.  Commenting Upon the Evidence

{¶ 89} The board also found that CMI and Christensen had committed the unauthorized practice of law by commenting upon the evidence during hearings. Section (B)(4) of the Resolution specifically prohibits this act.[38]  A review of the record, however, reveals no evidence that any CMI representative ever commented on the evidence during a hearing.

{¶ 90} Although a CMI representative might have altered the tone of his or her voice in order to emphasize some fact, no evidence exists that any representative actually commented upon the evidence.  Each representative testified that he or she had merely pointed to facts contained in the documents in the record.  When asked, Christensen testified that she had never pointed out that a specific doctor

---

37.  Christensen testified, for example, that she determined which medical records were important for any given hearing based upon her experience at the IC. But without any further information, it is impossible for this court to hold that that testimony proves that she practiced law.  Her experience at the IC could have involved simply determining which facts one should present when an employer claims that a prior injury existed.  Although it could also have involved making legal determinations about what sort of defenses are available to an employer, CBA failed to further examine this issue.

38.  A third-party administrator may not "[c]omment upon or give opinions with respect to the evidence, credibility of witnesses, the nature and weight of the evidence, or the legal significance of the contents of the file."  Section (B)(4) of the Resolution.

typically finds a higher percentage of impairment than any other doctor. CMI's policy on avoiding the unauthorized practice of law even strongly suggests that representatives "quote" portions of documents when necessary, implying that simply paraphrasing the factual information was not satisfactory. No witness claimed to have seen any CMI representative comment on the evidence, and at least one client stated that he attends most of the hearings for his employer and has never witnessed a CMI representative make any comments on the evidence.

{¶ 91} We found only two items of evidence in the record that could possibly be interpreted as a violation by Christensen of (B)(4). The first occurrence is in a posthearing letter in which Christensen writes: "[T]he District Hearing Officer announced she would allow the claim based on the claimant's very credible testimony." Although this sentence really needs little if any explanation to show that it was not a violation of (B)(4), Christensen stated during her deposition that the hearing officer herself had commented on the credibility of the claimant's testimony. Christensen did not comment that the claimant presented credible testimony and therefore did not comment on the evidence in that instance.

{¶ 92} The second occurrence is in testimony by Christensen in which, in response to a hypothetical question, she said that she "might" point out to a hearing examiner that four physicians had noted that a claimant had not given full effort during examination. If she did comment on the weight of the evidence in this fashion, she would likely cross the line created explicitly by the Resolution in Section (B)(4) and engage in the unauthorized practice of law. The evidence presented, however, is entirely speculative and in no way shows that Christensen in any particular case has actually made such a statement to the hearing officer. As no specific evidence shows that Christensen committed a violation in this area, the board's finding is unsupported. We reject the notion that CMI and Christensen committed the unauthorized practice of law, when no evidence supports a finding that any CMI representative ever commented on the evidence.

e. Summations of Evidence and Closing Statements

{¶ 93} The board found that CMI and Christensen had committed the unauthorized practice of law by giving summations of evidence and making closing statements. The board's findings, again, are simply not supported by the record.

{¶ 94} The record shows that when asked for a summation or closing statement, a CMI representative would merely restate the list of employer's concerns or point to facts in the file and request the final outcome desired by the employer. No evidence indicates that any CMI representative did otherwise.

{¶ 95} The Resolution does not specifically address whether a third-party administrator may conclude a hearing with a brief restatement of the employer's concerns by pointing out a previously overlooked or important fact, or by simply requesting the final outcome sought by the employer. Section (A)(3) does allow a

third-party administrator to point out a document, however, so the board's conclusion that a third-party administrator may not, on rebuttal, point out an additional fact or remind the hearing officer of a fact is quite strange.[39]  As noted above, the Resolution also allows a third-party administrator to present a statement of the employer's concerns, so any reiteration of the concerns likewise does not involve the practice of law.  Finally, simply requesting the ultimate outcome sought by the employer is not practicing law.  The practice of law involves arguing *why* the ultimate outcome is justified.  The summations of evidence and closing statements made by CMI representatives illustrated in the record simply do not involve any legal analysis and fall within the realm of activities allowed by the Resolution.  We, therefore, reject the board's determination that any form of summation or closing statement constitutes the unauthorized practice of law.

### f.  Counseling Clients

{¶ 96} The board also found that CMI and Christensen practiced law by counseling clients.  The board's finding with regard to counseling clients on whether to appeal or take other legal action is discussed below.  Here, we discuss other evidence that may be found to fall under the category of "counseling."

{¶ 97} Christensen stated that she would typically meet with an employer representative prior to the hearing in order to hear what that employer's representative planned to say in the hearing.  She also explained that, on occasion, she had told an employer's representative that certain facts the person planned to present were not relevant to the claim.  Christensen agreed that things such as how often the claimant made personal phone calls at work, as well as a claimant's race, religion, and sexual orientation were irrelevant to the allowance of a claim.

{¶ 98} Section (B)(5) and (B)(6) prohibit a third-party administrator from providing legal advice to an employer at any time during the claims process.  Christensen's testimony could be interpreted as legal advice to the employer as to what is and is not relevant to a claim.  When considered in context with the general operating procedure regarding hearings, however, it may be no more

---

39. It might appear that a representative would need to make legal determinations during the hearing in order to determine what facts should be offered in response to a claimant's presentation. This is not true.  No evidence shows that a hearing officer ever offered a fact in response that did not contradict a fact presented by the claimant.  For example, if the representative pointed out that a document in the file evidenced a prior back injury, and the claimant then denied any prior injury, even one untrained in the law would know that it might be prudent to remind the hearing officer of the medical record that conflicts with the claimant's testimony.  As long as the representative merely states facts from the record and makes no comment on the evidence or the credibility of the claimant, he does not stray beyond the bounds of action permitted by the Resolution.

than a factual judgment that a certain fact stated by the employer's representative does not relate factually to any of the employer's stated concerns.

{¶ 99} Although both interpretations are plausible, the board did not pinpoint any particular action by the CMI representatives that it found to violate the prohibition against counseling clients. It merely makes the general statement that CMI and Christensen committed the unauthorized practice of law by counseling clients, and failed to comment further. Moreover, CBA has not raised this issue in its briefs. Although we recognize that counseling of a witness prior to entering the hearing room likely crosses the line into the practice of law and is prohibited by the Resolution when that counseling involves any interpretation of law, no specific instances of this conduct are illustrated or supported by the record. We simply cannot tell whether the advice that Christensen admitted giving involved interpreting law or whether it involved merely determining whether a fact that the employee intended to mention during the hearing related to any of the employer's stated concerns. As with other alleged violations, the record includes only generalized evidence not sufficient to support a finding that any individual committed the unauthorized practice of law. We, therefore, reject the board's determination that any of the respondents committed the unauthorized practice of law in this regard.

g. Our General Conclusion Concerning CMI Representatives' Alleged Hearing–Room Advocacy

{¶ 100} After considering the six sub-issues contained within the board's report regarding hearing-room advocacy, we reject completely the board's finding that Christensen and CMI committed violations in this area. A third-party administrator's making of a statement regarding the employer's concerns is permitted under the Resolution and should be allowed to the extent that the employer generates those concerns and the CMI representative refrains from making legal analyses. Although the Resolution specifically prohibits third-party administrators from additional acts, we find no evidence to support a finding that a CMI representative ever prepared or made a legal argument, conducted direct or indirect examination of a witness, determined the legal significance of a fact, or commented on the evidence.[40] Further, the Resolution does not prohibit a CMI representative from restating the facts or the list of an employer's concerns and requesting a final outcome in summation as long as he refrains from conducting any legal argument or analysis. Finally, although advising an employer's repre-

---

40. The transcripts from two separate hearings attended by a CMI representative further support this. The difference between the acts of the claimants' attorneys and the CMI representative are striking. For example, the claimants' attorneys examined witnesses, while the CMI representative limited her actions to stating the employers' concerns and pointing out the documents in the record related to those concerns.

sentative prior to a hearing which facts are relevant to the claim and which are not may cross the line into acts prohibited by the Resolution where legal analysis is involved, no evidence of specific conduct violating this rule exists in the record. We therefore reject the board's determination and find no evidence that any of the respondents committed the unauthorized practice of law through hearing-room advocacy.

### 5.  Recommendations Regarding Appeals and Other Legal Action

{¶ 101} The board next found that Christensen and other CMI employees committed the unauthorized practice of law by evaluating IC decisions and making recommendations as to whether the employer should appeal based upon concerns not limited to cost.  The board specifically stated that the recommendations in this area were not "based solely upon financial and/or economic concerns for the employer client" and thus involved the practice of law.  The board also found that Christensen and other CMI employees practiced law by counseling clients as to whether they should take certain legal actions.

{¶ 102} In making its recommendation in this regard, the board relied upon (B)(2) through (B)(6), which, in general, prohibit a third-party administrator from citing, filing, or interpreting the law, giving legal interpretations based on the evidence, commenting on the legal significance of the evidence, providing legal advice, and rendering opinions based on law at any time during the proceedings.[41] The board found that the Resolution clearly bars a third-party administrator from recommending legal action of any type if based upon legal analysis.  The board did not comment upon whether providing any recommendation based upon financial concerns would likewise constitute the unauthorized practice of law. Because the board does not explicitly mention or cite any specific legal action, other than appeal, that it found CMI employees to have recommended to an employer, we must conduct an extensive review of all activity revealed in the record which might possibly fall within this finding.

### a.  Recommendations to Clients Regarding Appeal

{¶ 103} CMI regularly filed appeals at the direction of its clients using forms created by the IC and the BWC. CMI's president indicated that CMI would file an appeal only when a client expressed dissatisfaction with the order, and that CMI representatives were prohibited from making those recommendations regarding appeal in their posthearing letters.  CMI representatives did, however, enter recommendations regarding appeal in the in-house claims-management system, called TEAM or CAP, prior to July 2002, and a small percentage of

---

41.  Although the board also cites Section (B)(7) in support, that section specifically prohibits stand-alone representation at a workers' compensation hearing for a fee without provision of additional services.  It has no relevance here.

employers had access to that system. The recommendation, which could be as vague as "appeal at employer's discretion," however, was not communicated directly to the employer, and no evidence in the record shows that any employer actually ever read any recommendations regarding appeal on the TEAM or CAP systems.

{¶ 104} CMI representatives testified that the decision to appeal is left completely to the employer. CMI's state fund manager stated that she sometimes did receive questions from an employer regarding appeal, but that she would always give her advice in terms of the financial effect of the claim and leave the ultimate decision in the hands of the employer. CMI's senior vice president of operations concurred with previous testimony that when an employer does ask for advice, CMI gives only a financial analysis of the claim, and Christensen likewise testified that the recommendations she makes regarding appeal are cost driven.[42]

{¶ 105} Sections (B)(2) through (B)(6) of the Resolution generally prohibit a third-party administrator from interpreting the law or giving legal advice. Advising a client to appeal would generally fall under the category of giving legal advice, explicitly prohibited by (B)(5). Two problems with the board's analysis on this issue, nonetheless, exist. First, the record shows that, in the past, CMI made recommendations as to appeal only in its in-house claims-management system, and CBA failed to show that any client with access to the system ever read any CMI recommendation regarding appeal.[43] Barring CMI from entering into its own in-house claims-management system a recommendation as to whether its client should appeal would be the same as preventing a person from telling himself what he would do if he were faced with a third party's legal quandary. As long as that person never communicates his thoughts to the third party, he can hardly be said to have practiced law. CMI never communicated its recommendations to clients other than explaining whether appealing an order would likely cost more than not appealing, and no evidence shows that a client ever read a recommendation regarding appeal via the in-house claims-management system. CMI simply has not practiced law in this fashion.

---

42. Employees from two of CMI clients testified that cost did not factor into their determination whether to appeal. The clients' employees testified that the clients were more concerned with achieving a correct result and ensuring that a genuinely injured worker was compensated. The record does not contradict, however, CMI's assertion that it gave advice and made recommendations related only to financial concerns, not legal ones.

43. The record does not reveal why CMI wanted its claims representatives to add their recommendations to the in-house claims-management system if those recommendations were never communicated to the employer.

{¶ 106} Second, all CMI representatives who were asked testified that any advice or recommendation made to an employer revolved entirely around financial concerns. As long as the employer knows that the advice CMI gives relates to financial concerns alone and CMI representatives do not imply or state that the law drives their advice, CMI representatives act very much like any other individual who gives nonlegal advice. CMI may legitimately explain to an employer the costs of continuing to challenge a claim versus allowing the claim. See Section (A)(2) of the Resolution. Only if CMI gives legal advice would it violate the Resolution. For the foregoing reasons, we reject the board's finding that CMI gave its clients recommendations regarding appeal.

b. Advice to Clients Whether to Take Legal Action Other Than Appeal

{¶ 107} The board found that CMI and Christensen counseled clients "as to whether an appeal or other legal action should be taken." The board failed to clarify what "other legal action" Christensen and CMI counseled clients to take. After reviewing the record, we find that the acts that might arguably constitute advising clients to take legal action are either explicitly permitted by the Resolution,[44] were not demonstrated to require legal training or skill,[45] are not actually conducted by CMI,[46] or are not supported by evidence of specific instances.[47] The record shows that CMI does not recommend to employers that

---

44. Section (A)(3) of the Resolution permits a third-party administrator to request a postponement or continuance of a hearing.

45. These acts include the following: requesting a continuance where the need is obvious, i.e., the employer's representative suddenly is unable to attend the hearing, or the claimant failed to show up, or an independent medical exam is scheduled after the hearing date; scheduling an independent medical examination through an outside medical service scheduling group; processing requests for additional treatment, which actually requires medical judgment; reviewing medical bills to determine whether they are properly payable by comparing codes assigned to each type of injury and treatment; reviewing charges made against the experience of the employer and challenging overpayments and duplications; verifying completeness of medical reports indicating that a claimant should continue to receive temporary total disability benefits; updating employers on law or legal procedure by informing clients of changes in the law through a newsletter containing articles authored by attorneys; filing a motion to file a late appeal for review based upon the failure of the employer's not having received an IC or BWC order; and responding to claims complaints by the bureau against self-insured employers by providing relevant medical documents in CMI's possession. CMI also evaluates whether an employer could benefit from filing an application for handicap reimbursement for its clients and files that application where applicable. Evidence shows that CMI needs only to compare the allowed condition to those in a list compiled by the BWC in order to make this determination, an act that does not require legal training or skill.

46. These acts include attending hearings to determine whether the employer violated a specific safety requirement and filing motions for reconsideration permitted under *State ex rel. Gatlin v. Yellow Freight Sys., Inc.* (1985), 18 Ohio St.3d 246, 18 OBR 302, 480 N.E.2d 487.

47. Although the record contains some general evidence to support a finding that CMI improperly makes determinations whether a claim is compensable and the record is replete with training

they take legal action. Rather, it shows that CMI informs its clients of the likely financial effect related to each action that an employer might wish to take, an act generally permitted by Section (A)(2) of the Resolution. "We don't make any unilateral decisions for the clients. We explain to them what the cost would be. They determine if they choose to pursue * * * [an] appeal or anything of that nature."

{¶ 108} That CMI representatives use verbs such as "counsel" or "represent" to describe their work likewise does not prove that they practiced law. Proving that one party represented another, without more, is simply insufficient proof of practicing law, considering that persons and corporate entities routinely hire other persons to represent them in nonlegal matters. A broker, for example, represents his clients in making investments. A real-estate agent represents his client in the sale or purchase of a home. The act of representing an entity, therefore, does not equate to the practice of law unless it is accompanied by an act requiring legal skill. See *Gustafson v. V.C. Taylor & Sons, Inc.* (1941), 138 Ohio St. 392, 397, 20 O.O. 484, 35 N.E.2d 435. Similarly, one may "counsel" on a variety of topics entirely unrelated to law. One cannot honestly argue that a musician's counsel as to the proper way to create a musical composition or a butcher's counsel on what part of the pig is the tastiest in any way involves the practice of law. "Counseling" equates to the practice of law only when it involves a subject that requires legal skill and training.

c. Overall Conclusion

{¶ 109} We caution third-party administrators not to cross the line between offering advice on the most cost-effective actions to take and offering legal advice as to whether an action is legally supportable. The experience of CMI representatives undoubtedly provides a wealth of information and general understanding of the workers' compensation system and compensability issues generally. We remind all third-party administrators that this experience is not a substitute for

---

materials utilized by CMI that detail compensability issues, there is no evidence that the CMI representatives provided advice related to anything other than the likely cost if the employer chooses to allow the claim. The following two examples from the record serve to demonstrate the type of evidence that the board may have believed supported such a finding. First, a CMI representative stated that she would raise an obvious legal issue if overlooked by an employer when determining whether to allow a claim, but no specific instances of this occurrence were demonstrated. Second, one of Christensen's posthearing letters stated as follows: "It would appear as though claimant's counsel is indeed correct in the matter and claimant is entitled to the entire permanent partial amount. After listening to the statements presented, the Hearing Officer announced he would grant the motion." This statement, however, may simply be a reiteration of the hearing officer's determination and not any legal judgment regarding compensability on Christensen's part. If CMI representatives were to give advice to employers about whether a claim was compensable, he or she would violate the Resolution and commit the unauthorized practice of law. There are simply no specific examples of this in the record.

the legal training and skill necessary to practice law. Giving legal advice is not only specifically barred by the Resolution, but is also clearly practicing law.

{¶ 110} The record before us does not support a finding that CMI or Christensen engaged in any specific act violating the Resolution in this area. We, therefore, reject the recommendation of the board and find that CBA has failed to show that CMI or Christensen committed the unauthorized practice of law by evaluating legal options, such as appeal, and giving advice relating to those options.

## 6. Evaluation, Advice, or Recommendation on Retaining Counsel

{¶ 111} After recognizing that Section (A)(9) specifically allows third-party administrators to recommend to clients that they seek legal counsel, the board cautioned that the analysis that a third-party administrator engages in to make that determination may constitute the practice of law.

{¶ 112} CMI's attorney-referral policy is that its employees are to recommend that a client seek legal counsel when a claim involves an occupational disease, a catastrophic loss, legal analysis, or the need for cross-examination. An employer, however, need not follow that recommendation, and a CMI representative testified that although she had never known an employer to not follow CMI's recommendation to obtain an attorney, if the employer insisted, CMI would handle the claim, but within the confines of the Resolution. An employer may also, of course, decide to retain legal counsel without a recommendation from CMI. No evidence indicates that a CMI representative ever explicitly told an employer that it did *not* need to retain counsel. CMI clients indicated that they often retained counsel to handle complicated claims and claims that would necessarily involve interpreting case law, but would rely upon CMI to handle claims that involved only medical issues.

{¶ 113} The record is somewhat unclear as to how CMI representatives determine whether to recommend retention of counsel. Section (A)(9) of the Resolution does specifically allow a third-party administrator to make the recommendation to retain counsel, and by doing so, implicitly acknowledges that a third-party administrator should recognize when a claim falls outside its abilities. In addition, a holding by this court allowing a third-party administrator to advise an employer to retain counsel, but prohibiting the third-party administrator from making the determination whether to retain counsel, would be absurd.

{¶ 114} Section (A)(9) specifically allows a third-party administrator to advise an employer to seek legal counsel, and there is no evidence in the record that any CMI representative ever did anything but this specific act. CMI representatives understand the limits of their abilities and recognize when claims are outside of their ability, necessitating the advice to retain counsel. We hold that respon-

dents have not committed the unauthorized practice of law in determining whether an employer should seek legal counsel.

## OTHER OBJECTIONS

{¶ 115} In addition to objections already addressed by this court, CBA has raised objections in various other areas related to corporate-officer liability and the imposition of sanctions. Any issues related to corporate-officer liability and sanctions are moot in light of our holding that the record does not support a finding that any respondent has committed the unauthorized practice of law. As no respondent has committed any violations, sanctions are inappropriate.

## CONCLUSION

{¶ 116} We hold that an allegation that an individual or entity has engaged in the unauthorized practice of law must be supported by either an admission or other evidence of the specific act or acts upon which the allegation is based. Further, a third-party administrator may make actuarial determinations regarding settlement, act as a messenger for the employer in regard to settlement, and file settlement applications without conducting the unauthorized practice of law, as these activities do not require the specialized training and skill of an attorney and are permitted by Resolution No. R04–1–01. We also hold that at a hearing before the Bureau of Workers' Compensation or the Industrial Commission, a third-party administrator who has not asked a question of the witness has not conducted an "examination" of the witness and, thus, has not engaged in the practice of law. A third-party administrator may properly communicate the employer's areas of concern to the hearing officer, who may then ask questions of the witness. Finally, we hold that if a list of employer concerns is generated entirely by the employer, is not drafted to persuade or to advocate, and is stated as a factual concern, a third-party administrator may present those concerns to the hearing officer without violating Resolution No. R04–1–01.

{¶ 117} After a thorough review of the record and allegations, we reject the final report of the board and find no evidence that any of the respondents committed any specific act constituting the unauthorized practice of law. Many acts that the board found to be the practice of law do not require legal training, and those acts that do require legal training that the board found CMI to have committed were not supported by the evidence. Further, in order to support an allegation of the unauthorized practice of law, a respondent must admit to conducting the specific act or relator must present evidence of a specific violation. In many instances, CBA has failed to support its allegations with evidence of

specific acts that are prohibited. Accordingly, we dismiss the claims against the respondents.

Judgment accordingly.

MOYER, C.J., LUNDBERG STRATTON, O'DONNELL and LANZINGER, JJ., concur.

RESNICK, J., concurs in judgment only.

PFEIFER, J., concurs in part and dissents in part.

---

**PFEIFER, J., concurring in part and dissenting in part.**

{¶ 118} I concur in paragraph one of the syllabus and agree with the main thesis of the majority opinion that the record does not contain evidence of specific unauthorized-practice-of-law violations.

{¶ 119} In *Cleveland Bar Assn. v. CompManagement, Inc.*, 104 Ohio St.3d 168, 2004-Ohio-6506, 818 N.E.2d 1181, this court acceded to allowing nonattorneys to perform tasks that amount to the practice of law. I dissented to that opinion. Id. at ¶ 72–73. Today the majority opinion appears to allow even more latitude to nonattorneys who facilitate workers' compensation claims.

{¶ 120} I concur in part and dissent in part.

---

Willacy, LoPresti & Marcovy and Aubrey B. Willacy; Michael P. Harvey Co., L.P.A., and Michael P. Harvey, for relator.

Baker & Hostetler, L.L.P., Robert M. Kincaid Jr., Elizabeth A. McNellie, and Rodger L. Eckelberry, for respondent CompManagement, Inc.

Hanna, Campbell & Powell, L.L.P., Douglas N. Godshall, Timothy C. Campbell, and John R. Chlysta, for respondent Bobbijo Christensen.

Jim Petro, Attorney General, Douglas R. Cole, State Solicitor, and Melissa A. Warheit, Assistant Solicitor, in support of neither party, for amicus curiae the state of Ohio.

Eugene P. Whetzel, in support of relator, for amicus curiae Ohio State Bar Association.

Philip J. Fulton Law Office and Philip J. Fulton, in support of respondents, for amicus curiae Ohio Academy of Trial Lawyers.

Stewart, Jaffy & Associates Co., L.P.A., Stewart R. Jaffy, and Marc J. Jaffy, in support of respondents, for amicus curiae Ohio AFL–CIO.

Garvin & Hickey, L.L.C., Preston J. Garvin, Michael J. Hickey, and Sandee E.B. Reim; Bricker & Eckler, L.L.P., and Thomas R. Sant; Vorys, Sater, Seymour & Pease, L.L.P., Robert A. Minor, and Robin Obetz; Squire, Sanders & Dempsey, L.L.P., Steven M. Loewengart, and Greta M. Kearns, in support of respondents, for amici curiae Ohio Chamber of Commerce, Ohio Chapter of the National Federation of Independent Business, Ohio Farm Bureau Federation, Ohio Manufacturers Association, Ohio Self–Insurers' Association, and Council of Smaller Enterprises.

Zeiger, Tigges & Little, L.L.P., John W. Zeiger, Steven W. Tigges, and Stuart G. Parsell, in support of respondents, for amici curiae Service Association of Ohio, Ohio Association of Better Business Bureaus, Ohio Newspaper Association, Dayton Area Chamber of Commerce, Findlay–Hancock County Chamber of Commerce, Springfield–Clark County Chamber of Commerce, Southeastern Franklin County Chamber of Commerce, Youngstown/Warren Regional Chamber, St. Marys Area Chamber of Commerce, Columbus Medical Association, Columbus Chamber of Commerce, County Commissioners Association of Ohio, Cincinnati USA Regional Chamber, Greater Akron Chamber of Commerce, Ohio School Boards Association, National Employers Network Alliance, Ohio Home Builders Association, Ohio Small Business Association, Ohio Automobile Dealers Association, Employers' Association, Ohio Contractors Association, Ohio Restaurant Association, Ohio Dental Association, Independent Insurance Agents of Ohio, Inc., Ohio Pharmacists Association, Ohio Association of Public Treasurers, Builders Exchange, Inc., Ohio Association of Convenience Stores, Builders Exchange of East Central Ohio, Ohio Savings Financial Corporation, Consulting Services Employee Benefits Agency of Ohio, Inc., Dayton Tooling and Manufacturing Association, Poly–Foam International, Inc., Ohio Pawnbrokers Association, Ohio Ready Mixed Concrete Association, National Electrical Contractors Association Ohio Conference L.L.C., National Retail Hardware Association, North American Employers' Council, Inc., Ohio Council of Retail Merchants, Ohio Grocers Association, Ohio Health Care Association, Ohio Association of Health Underwriters, Ohio Optometric Association, Ohio Land Title Association, Workers' Compensation Forum, Ohio–Michigan Equipment Dealers Association, East Central Ohio Food Dealers Association, Ohio Petroleum Retailers & Repair Association, Ohio Hospitals Group Rated Workers' Compensation, Inc., Ohio Tire Dealers and Retreaders Association, Ohio Township Association, Ohio Trucking Association, Professional Insurance Agents Association of Ohio, Inc., Ohio Nursery and Landscape Association, Inc., Ohio Wholesale Marketers Association, Community Bankers Association of Ohio, Ohio Library Council, Ohio Lawn Care Association, Ohio Auto & Truck Recyclers Association, Union Metal Corporation, Association of Philanthropic Homes, Housing and Services for the Aging, Ohio Construction Suppliers Association, American Rental Association of Ohio, Air Conditioning

Contractors of America—Ohio Chapter, Ohio Automatic Merchandisers Association, Wholesale Beer and Wine Association of Ohio, Allied Construction Industries, Ohio Association of McDonald's Operators, Ohio Veterinary Medical Association, Ohio Bakers Association, Ohio Counsel of Behavioral Healthcare Providers, Ohio Golf Course Owners Association, Greater Cleveland Chapter of National Electrical Contractors Association, Ohio Association of Plumbing Heating Cooling Contractors, Inc., Associated Builders and Contractors Ohio Valley Chapter, Bowling Centers Association of Ohio, National Association of Theatre Owners of Ohio, Miami Valley Risk Management Association's Workers' Compensation Group Rating Plan, American Council of Engineering Companies of Ohio, and Ohio Association of School Business Officials.